UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION

| | | |
|---|---|---|
| PEDRO GARZA LEAL, | § | |
| | § | |
| Plaintiff, | § | |
| VS. | § | CIVIL ACTION NO. 6:20-CV-25 |
| | § | |
| ANDREW SAUL, | § | |
| | § | |
| Defendant. | § | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Plaintiff Pedro Garza Leal brought this action on April 13, 2020, seeking review of the Commissioner's final decision determining he was not disabled. (D.E. 1). On March 8, 2021, Plaintiff filed a Brief in Support of Claim, construed as a Motion for Summary Judgment. (D.E. 22). On April 8, 2021, Defendant filed a Brief in Support of Claim, construed as a Cross Motion for Summary Judgment. (D.E. 24). For the reasons below, the undersigned finds the Administrative Law Judge's ("ALJ's") decision is supported by substantial evidence and the ALJ applied the correct legal standards when making his findings. Accordingly, Plaintiff's Motion for Summary Judgment is **DENIED**, the Commissioner's Motion for Summary Judgment is **GRANTED**, the Commissioner's determination is **AFFIRMED**, and this case is **DISMISSED with prejudice**.

# I.    JURISDICTION

The Court has jurisdiction over the subject matter and the parties pursuant to 42 U.S.C. § 405(g) and this case has been reassigned to the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636.  (D.E. 13; D.E. 15 and D.E. 16).

# II.   ISSUES PRESENTED

Plaintiff contends the ALJ failed to properly evaluate the opinion of Dr. Michael McLeod, a treating physician, and Plaintiff's mental ailments when determining Plaintiff's Residual Functional Capacity ("RFC").  Plaintiff further asserts the ALJ failed to properly consider Plaintiff's work history when assessing Plaintiff's credibility related to his subjective complaints.

# III.  STANDARD OF REVIEW

Judicial review of the Commissioner's decision regarding a claimant's entitlement to benefits is limited to two questions: (1) whether substantial evidence supports the Commissioner's decision; and (2) whether the decision comports with relevant legal standards.  *Carey v. Apfel*, 230 F.3d 131, 135 (5th Cir. 2000).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Id.* (citation omitted); *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citation omitted).  The burden has been described as more than a scintilla but lower than a preponderance.  *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995) (citation omitted).  A finding of "no substantial evidence" occurs "only where there is a 'conspicuous absence of credible choices' or 'no contrary medical evidence.'" *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988) (citations omitted).

In applying the substantial evidence standard, the Court scrutinizes the record to determine whether such evidence is present. However, the Court does not reweigh the evidence, try the issues de novo or substitute its judgment for that of the Commissioner. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994) (citations omitted); *Carey*, 230 F.3d at 135 ("Conflicts in the evidence are for the Commissioner to resolve.") (citation omitted). It is incumbent upon the Court to look at the evidence as a whole and take into account the following factors: (1) objective medical evidence or clinical findings; (2) diagnosis of any examining physician; (3) subjective evidence of pain and disability and (4) the claimant's age, education and work history. *Wren v. Sullivan*, 925 F.2d 123, 126 (5th Cir. 1991) (citation omitted).

In evaluating a disability claim, the Commissioner follows a five-step process to determine whether (1) the claimant is presently working; (2) the claimant's ability to work is significantly limited by a physical or mental impairment; (3) the claimant's impairment meets or equals an impairment listed in the appendix to the regulations; (4) the impairment prevents the claimant from doing past relevant work; and (5) the claimant cannot presently perform relevant work. *Martinez v. Chater*, 64 F.3d 172, 173-174 (5th Cir. 1995) (citations omitted). The claimant bears the burden of proof on the first four steps with the burden shifting to the Commissioner at the fifth step who must show that, in light of claimant's RFC, claimant can perform other substantial work in the national economy. *Bowling v. Shalala*, 36 F.3d 431, 435 (5th Cir. 1994).

## IV. BACKGROUND

Plaintiff filed an application for disability insurance benefits and for supplemental security income benefits on November 28, 2016, alleging disability as of October 16, 2015, due to depression, anxiety, severe left elbow and arm injury, high blood pressure, learning disability, chronic ulcers, leg and feet pain, back pain, migraines and neck ailments.  (D.E. 20-3, Page 11; D.E. 20-7, Page 27; D.E. 22, Page 2 and D.E. 24, Page 3). Plaintiff's applications were denied administratively.  (D.E. 20-4, Pages 16 and 47-48). At Plaintiff's request, a hearing was held before an ALJ on March 7, 2019, at which Plaintiff, who was represented by counsel, and a vocational expert ("VE") testified. (D.E. 20-3, Pages 35-65).  Plaintiff was 47 years old on his alleged onset date and 51 years old at the hearing.  (D.E. 20-3, Page 38 and D.E. 20-4, Page 47).  The ALJ issued an unfavorable decision on April 17, 2019, finding Plaintiff not disabled through the date of the decision.  (D.E. 20-3, Pages 11-26).

The Appeals Council declined Plaintiff's request for review on February 12, 2020, making the ALJ's April 17, 2019 decision final.  (D.E. 20-3, Pages 2-7).  Plaintiff then filed this action on April 13, 2020, seeking review of the Commissioner's final decision. (D.E. 1).

## V. SUMMARY OF THE RECORD[1]

On July 7, 2014, images of Plaintiff's cervical spine indicated it was normal. (D.E. 20-8, Page 6).  The same day, images of Plaintiff's left arm found "[n]o acute

---

[1]The undersigned spent a significant amount of time reviewing and considering the entire record.  The failure to reference all records in this summary does not mean all records were not reviewed and considered.

appearing left humeral fracture or dislocation" but "degenerative changes [were] noted at the left elbow." (D.E. 20-8, Pages 7-8). Plaintiff had a compound fracture of his left arm as a child, requiring multiple surgeries. (D.E. 20-3, Pages 47-58 and D.E. 20-23, Page 49).

On July 17, 2014, an MRI of Plaintiff's cervical spine indicated Plaintiff had "[n]o significant abnormality" and it was determined that Plaintiff's cervical spine and the upper two thoracic segments were normal. (D.E. 20-8, Page 3).

Physical therapy notes from July through October 2014 indicate Plaintiff reported his neck and back pain was a seven out of ten, a four out of ten with pain medication and was aggravated by sitting, standing, turning his head and activity. (D.E. 20-8, Pages 12-28 and D.E. 20-9, Pages 29-54).

Plaintiff was treated by Dr. McLeod on December 24, 2014 complaining of a sore throat, congestion and fever. (D.E. 20-18, Page 60). He also stated he was having left upper arm pain and was "needing some paperwork filled out." (D.E. 20-18, Page 60). Plaintiff was prescribed a Z-Pak. (D.E. 20-18, Page 60).

On January 26, 2015, Plaintiff was treated by Dr. McLeod for low back pain and for blood in his stool. (D.E. 20-18, Page 58). A full set of labs was order and Plaintiff was to be scheduled for a colonoscopy. (D.E. 20-18, Page 58).

Plaintiff was again treated by Dr. McLeod on February 17, 2015 for a follow up after a colonoscopy. (D.E. 20-18, Page 57). Plaintiff reported having "lower back pain, which is causing him some trouble with range of motion and some trouble with work." (D.E. 20-18, Page 57). Dr. McLeod ordered x-rays of Plaintiff's lumbar spine and

prescribed an anti-inflammatory medication.  (D.E. 20-18, Page 57).  On February 19, 2015, images of Plaintiff's lumbar spine indicated "[n]o significant bone, disc space or joint space abnormality seen," concluding it was an "unremarkable examination of the lumbar spine."  (D.E. 20-10, Page 47).

On March 2, 2015, Plaintiff was treated by Dr. McLeod for lumbar back pain. (D.E. 20-18, Page 56).  Dr. McLeod noted Plaintiff's "lumbar view x-rays demonstrates essentially no abnormalities according to radiology.  He is thought to have some disc disease there."  (D.E. 20-18, Page 56).  Plaintiff's medications were continued and he was advised to continue stretching exercises.  (D.E. 20-18, Page 56).

Plaintiff was again treated by Dr. McLeod on April 2, 2015 for lumbar back pain. (D.E. 20-18, Pages 55-57).  He noted Plaintiff "has done pretty well with the Ultram that we had given him in the past" and other than slightly elevated blood pressure "is otherwise doing okay."  (D.E. 20-18, Page 55).  Plaintiff's Ultram (also known as Tramadol, a narcotic pain medication) dose was increased.  (D.E. 20-18, Page 55).

On May 7, 2015, Plaintiff was treated by Dr. McLeod after a fall.  (D.E. 20-11, Page 36).  Plaintiff complained of worsening back pain.  Dr. McLeod noted Plaintiff had "back pain with range of motion" but no bruising.  (D.E. 20-11, Page 36).  Dr. McLeod noted he had "strongly encouraged [Plaintiff] to keep his current pain medications without any increase of dosing, to continue to use anti-inflammatories and see if we can get him feeling more comfortable that way.  To be careful about further falls, I will watch blood pressure more closely and we will see how things go from there."  (D.E. 20-11,

Page 36).   Plaintiff's medications are noted as Flexeril (a muscle relaxant) and Ultram. (D.E. 20-11, Page 36).

On June 10, 2015, Plaintiff was treated by Dr. Sidney Ontai.   (D.E. 20-14, Pages 7-8).   Dr. Ontai opined Plaintiff had fibromyalgia and prescribed Gabapentin (nerve pain medication).   (D.E. 20-14, Page 8).   Plaintiff is noted as oriented to time, place and person and as having a normal gait and stance, motor strength, balance and muscle tone. (D.E. 20-14, Page 7).   His attitude is noted as normal, his mood euthymic and his affect was normal.   (D.E. 20-14, Page 8).

Plaintiff was again treated by Dr. McLeod on July 1, 2015.   (D.E. 20-11, Page 34). Plaintiff was noted as "doing relatively well" and "[h]is pain control has been pretty reasonable" with no neuropathic pain.   (D.E. 20-11, Page 34).   Plaintiff's received refills of his existing medications.   (D.E. 20-11, Page 34).

An MRI of Plaintiff's lumbar spine on December 15, 2015 found Plaintiff had maintained disc spaces with mild disc bulges identified at L 4/5 and L5/S1, more pronounced at L4/5.   (D.E. 20-10, Pages 41-42).

On December 25, 2015, Plaintiff was treated at Cuero Community Hospital with complaints of body aches, sore throat, weakness, wheezing and chest tightness and pain. (D.E. 20-10, Pages 30-40).   Plaintiff is noted as being in no apparent distress with a normal mood and affect, oriented to person, place and time and having a normal range of motion in his extremities.   (D.E. 20-10, Page 36).   He was diagnosed with a sinus infection and discharged the same day with a prescription for his cough and he reported he was feeling better.   (D.E. 20-10, Pages 31, 33 and 36).

On January 8, 2016, Plaintiff was treated by Dr. McLeod for hypertension. (D.E. 20-11, Pages 67-68). Plaintiff also complained of lumber back pain and is noted as alert, cooperative and oriented with a normal gait. (D.E. 20-11, Page 67). Dr. McLeod noted Plaintiff "has extensive pain to left elbow with chronic deformity" and has lower lumbar back pain and a "restricted range of motion around lumbar back." (D.E. 20-11, Page 68). Plaintiff was prescribed Tylenol with Codeine, Mobic and Cyclobenzaprine (a muscle relaxant). (D.E. 20-11, Page 68 and D.E. 20-18, Page 4).

Dr. McLeod next treated Plaintiff on March 9, 2016. (D.E. 20-11, Pages 65-66). Plaintiff complained of lumbar back pain and requested stronger pain medication. (D.E. 20-11, Page 65). Plaintiff reported his pain was relieved by rest and pain medication. (D.E. 20-11, Page 65). It is noted that Plaintiff was seen by an orthopedic surgeon who recommended physical therapy. (D.E. 20-11, Page 65). Plaintiff is also noted as alert, cooperative and oriented with a normal gait. (D.E. 20-11, Page 65). Dr. McLeod continued reporting Plaintiff's left elbow deformity and his restricted range of motion in his back. (D.E. 20-11, Page 66). Plaintiff's medications, in relevant part, are noted as Tylenol with Codeine and Mobic. (D.E. 20-11, Page 66).

On April 12, 2016, Plaintiff was again treated by Dr. McLeod. (D.E. 20-11, Pages 63-65). Plaintiff complained of lumbar back pain relieved by rest and pain medication and also complained of bladder ailments. (D.E. 20-11, Page 63). Plaintiff reported he was unable to complete the activities of daily living. (D.E. 20-11, Page 63). He was noted as alert, cooperative and oriented. (D.E. 20-11, Page 63). Plaintiff was continued

on Tylenol with Codeine and Mobic and referred to pain management as well as to an orthopedic surgeon for treatment of his elbow. (D.E. 20-11, Page 64).

Images of Plaintiff's left elbow on April 27, 2016 showed advanced degenerative and osteoporotic changes of the left elbow with chronic nonunion left ulnar fracture. (D.E. 20-11, Page 58).

Plaintiff was treated by Dr. McLeod on June 29, 2016. (D.E. 20-11, Pages 61-62). Plaintiff complained of neck pain, neck stiffness, muscle spasm and tenderness. (D.E. 20-11, Page 61). Plaintiff requested stronger medication for his neck pain. (D.E. 20-11, Page 61). Plaintiff's medications, in relevant part, are noted as Mobic and Tylenol with Codeine. (D.E. 20-11, Pages 61-62). Plaintiff is noted as alert, cooperative and oriented. (D.E. 20-11, Page 61). The overall impression was pain associated with chronic deformed elbow and cervical back pain with evidence of disc disease. (D.E. 20-11, Page 62).

Images and an MRI of Plaintiff's cervical spine on July 5, 2016 found: "Minimal degenerative change is noted within the mid-cervical spine. There is no acute fracture or subluxation." (D.E. 20-11, Page 51). The conclusion was "mild degenerative changes, cervical spine." (D.E. 20-11, Page 51). The MRI showed normal disc height and signal at C2/C3, C3/4 and C7/T1 with disc bulges noted at C4/C5, C5/C6 and C6/C7 with no significant central canal stenosis. (D.E. 20-11, Page 52). The conclusion was "mild degenerative disc changes of the cervical spine." (D.E. 20-11, Page 52).

On July 28, 2016, Plaintiff was treated by Dr. McLeod. (D.E. 20-11, Pages 59-60). Plaintiff is noted as alert, cooperative and oriented to time, place and person. (D.E.

20-11, Page 59).  Dr. McLeod noted Plaintiff has extensive pain in his left elbow with chronic deformity with a decreased range of motion overall.  (D.E. 20-11, Page 60).  He further noted Plaintiff had lower lumbar back pain with a restricted range of motion.  (D.E. 20-11, Page 60).  Dr. McLeod also found Plaintiff was "continuing to subsist on the medication and relying upon it for activities of daily living."  (D.E. 20-11, Page 60).  Plaintiff's medications, in relevant part, are noted as Tylenol with Codeine, Mobic and Cyclobenzaprine.  (D.E. 20-11, Page 60).

An August 3, 2016 MRI of Plaintiff's lumbar spine showed no issues at L1/L2, L2/L3, or L3/L4.  (D.E. 20-11, Page 54).  At L4/L5, a small broad based disc bulge with mild narrowing was shown along with moderate central canal stenosis and facet hypertrophy.  (D.E. 20-11, Page 54).  At L5/S1, a broad based posterior disc bulge was noted with mild effacement of the thecal sac with no significant central canal stenosis.  (D.E. 20-11, Page 54).  The conclusion was "degenerative changes of the lower lumber spine, not significantly changed from prior study [in December 2015]."  (D.E. 20-11, Page 54).

On August 29, 2016, Plaintiff was treated by Dr. McLeod for lumbar back pain and a follow-up on his MRI.  (D.E. 20-18, Pages 17-19).  Plaintiff is noted as alert, cooperative and oriented.  (D.E. 20-18, Page 18).  Plaintiff's Tylenol with Codeine prescription was continued and Dr. McLeod opined Plaintiff "has been unable to afford the higher level of consultation [which] might afford him an improvement especially with his back.  His elbow is most likely nonsurgical according to Orthopedics.  He has no ability to work at this time…and is clearly disabled physically."  (D.E. 20-18, Page 19).

Plaintiff was next treated by Dr. McLeod on August 31, 2016. (D.E. 20-10, Pages 58-60). Treatment notes indicate Plaintiff was there for a physical, specifically a "work restriction physical" for the Texas Depart of Assistive and Rehabilitative Services ("DARS"). (D.E. 20-10, Page 58). Plaintiff reported neck pain, neck stiffness and muscle spasm without tenderness, with symptoms "moderate in severity and worsening." (D.E. 20-10, Page 58). Plaintiff is noted as alert, cooperative, oriented and well nourished. (D.E. 20-10, Page 59). Dr. McLeod noted Plaintiff had "extensive pain to left elbow with chronic deformity" and "has lumbar back pain to palpation as well" with a restricted range of motion. (D.E. 20-10, Page 60). Plaintiff is noted as requesting stronger pain medication and frequently falling short on his supply for the month. (D.E. 20-10, Pages 58 and 60). His medications were continued. It is noted no further surgical options are likely to assist his chronic deformed elbow and associated pain. (D.E. 20-10, Page 60). Dr. McLeod completed a work restriction checklist for DARS. (D.E. 20-11, Pages 46-47). Dr. McLeod opined Plaintiff could continuously sit, occasionally stand and never walk during an 8-hour workday. (D.E. 20-11, Page 46). He further opined Plaintiff could never bend, squat, kneel, twist or reach; could not grasp, assemble or push or pull with his left hand; could not assemble at high speeds or push or pull with his right hand and could not work in heat. (D.E. 20-11, Page 47). Dr. McLeod concluded "Patient is clearly medically disabled entirely. Patient unable to use left arm; Back Pain persistent even with ADL's (activities of daily living)." (D.E. 20-11, Page 47).

Dr. McLeod treated Plaintiff on September 28, 2016 for neck pain, neck stiffness and muscle spasm. (D.E. 20-18, Pages 23-25). Plaintiff reported the prescribed Tylenol

with Codeine was not helping. (D.E. 20-18, Page 23). As for lower back pain, Dr. McLeod noted he was "waiting to hear form DARS about back injections." (D.E. 20-18, Page 23). Plaintiff is noted as alert, cooperative and oriented with a normal gait. (D.E. 20-18, Page 24).

On October 31, 2016, Dr. McLeod again treated Plaintiff, noting he was alert, cooperative and oriented with a normal gait. (D.E. 20-18, Page 24). Dr. McLeod noted the same ailments as previous appointments and continued Plaintiff on his medications, adding Norco (hydrocodone). (D.E. 20-18, Pages 25 and 26). Dr. McLeod continued to note Plaintiff's left elbow deformity and his restricted range of motion in his back. (D.E. 20-18, Page 25).

On November 16, 2016, Plaintiff was treated at the South Texas Brain and Spine Center by Dr. Howard Smith. (D.E. 20-10, Pages 61-64). Plaintiff reported back pain/lumbar radiculopathy. (D.E. 20-10, Page 61). Plaintiff further reported pain radiating down both legs, neck, hips, back and arms which was made worse by walking, standing, sitting, lying down and bending. (D.E. 20-10, Page 61). Dr. Smith noted Plaintiff's lumbar and cervical spine MRIs showed mild deficiencies and that Plaintiff brought functional capacity evaluation forms with him. (D.E. 20-10, Page 61). Plaintiff is noted as well developed, in no acute distress, using no assistive devices and with an intact recent and remote memory. (D.E. 20-10, Page 62). Dr. Smith noted plaintiff "has a great deal of pain behavior" to even mild palpation. (D.E. 20-10, Page 63). Dr. Smith told Plaintiff that he "did not see anything to account for his difficulties in his cervical or

lumbar spine MRI," offering to conduct further tests and declining to complete the functional capacity form. (D.E. 20-10, Page 63).

Plaintiff was treated by Dr. Douglas Matey at the Victoria Orthopedic Center for left arm on November 21, 2016. (D.E. 20-11, Page 25). Plaintiff reported left arm trauma as a child which required multiple surgeries. (D.E. 20-11, Page 25). Plaintiff further reported significant pain in his left elbow, stating "it locks and it affects the functionality of his left arm." (D.E. 20-11, Page 25). Dr. Matey noted there was "an obvious deformity about the left forearm," limiting his range of motion. (D.E. 20-11, Page 25). Dr. Matey opinion Plaintiff had chronic left elbow osteoarthritis and nonunion left ulnar shaft. (D.E. 20-11, Page 25). Dr. Matey advised Plaintiff "in great detail" that he should see "a dedicated elbow and forearm specialist for consideration of revision surgery for his left ulna nonunion and consideration of left elbow surgery." (D.E. 20-11, Page 25).

Plaintiff filed an application for disability insurance benefits and for supplemental security income benefits on November 28, 2016, alleging disability as of October 16, 2015. (D.E. 22, Page 2).

Dr. McLeod treated Plaintiff on November 30, 2016 for lumbar back and neck pain. (D.E. 20-18, Pages 26-29). He noted "DARS is sending him to two drs for surgery and also have a stress test on 12/2/16." (D.E. 20-18, Page 26). Plaintiff is again noted as alert, cooperative and oriented. (D.E. 20-18, Page 27). Dr. McLeod also noted Plaintiff "has had a recent disability hearing and was denied once again. He is working on other legal means to help obtain this. He will be continuing current medications at this time."

(D.E. 20-18, Page 28).   Plaintiff was continued on Cyclobenzaprine, Mobic and Norco. (D.E. 20-18, Page 28).

On December 1, 2016, Dr. McLeod completed a residual functional capacity form. (D.E. 20-17, Page 30).   He reported Plaintiff's symptoms to be back, neck and left arm pain with muscle spasm, diagnosing him with lumbar and cervical disc disease and left elbow neuropathy.   (D.E. 20-17, Page 30).   Dr. McLeod noted there was "very little chance of improvement."   (D.E. 20-17, Page 31).   He further noted Plaintiff could stand for two to three hours per day and could walk 200 yards without stopping.   (D.E. 20-17, Pages 31-32).   Dr. McLeod opined Plaintiff could not reach above his shoulders, reach down to waist level or towards the floor and could not carefully handle objects or handle them with his fingers.   (D.E. 20-17, Page 32).   He further opined Plaintiff could lift and carry 5-10 pounds regularly and could not bend, squat, kneel or turn.   (D.E. 20-17, Page 32).   Dr. McLeod further stated Plaintiff could travel alone.   (D.E. 20-17, Page 33).   He concluded Plaintiff was disabled because he was unable to use his left arm and had back pain.   (D.E. 20-17, Page 34).

December 13, 2016 x-rays of both Plaintiff's cervical and lumbar spine were normal.   (D.E. 20-11, Pages 3 and 5).   Specifically, it was noted for both that the "intervertebral disc spaces, vertebral body heights, and vertebral body alignment are well maintained [with] no evidence of acute fracture or subluxation…no significant motion on the flexion extension views…minimal osteophytes are present at L5 [and] prevertebral soft tissues are unremarkable."" (D.E. 20-11, Pages 3 and 5).   The overall impression for both was "no acute findings."   (D.E. 20-11, Pages 3 and 5).

Also on December 13, 2016, Plaintiff underwent an electrodiagnostic study by Dr. Richard Sawyers, specifically electromyography ("EMG") and nerve conduction studies of Plaintiff's upper and lower extremities related to his complaints of radicular pain, low back and neck pain as well as left arm pain. (D.E. 20-11, Pages 17-24). Dr. Sawyers opined: "This electrodiagnostic study of the bilateral upper and lower extremities was felt to contain no significant abnormalities. Some very minor changes on EMG in the left lower extremity foot but they are of questionable clinical significance." (D.E. 20-11, Page 18).

On December 19, 2016, Plaintiff was treated by Dr. Ryan Thomas at South Texas Bone and Joint. (D.E. 20-11, Pages 11-12). Plaintiff's chief complaint was left arm pain. (D.E. 20-11, Page 11). Plaintiff reported the pain was severe, limiting his range of motion. (D.E. 20-11, Page 11). Plaintiff further reported he was "unable to gain employment because of left arm pain." (D.E. 20-11, Page 11). Plaintiff is noted as being "alert and oriented to time and place" with "a normal gait and normal affect and [able to] ambulate into the clinic today under [his] own power." (D.E. 20-11, Page 11). Dr. Thomas noted x-rays of Plaintiff's left arm "show some probably Mayo 1 degenerative elbow as well as what looks like a hypertrophic nonunion of the ulna [with] some sclerosis around the bone, some periosteal elevation as well, suspicious for underlying osteomyelitis." (D.E. 20-11, Page 12). Dr. Thomas discussed treatment options with Plaintiff, including the use of injections and braces as well as surgical intervention. Dr. Thomas noted his suspicion that it "might be osteomyelitis" but an MRI or bone scan was

needed and a CT-guided biopsy followed by six week of IV antibiotics and a nonunion correction of the left ulna if there was evidence of osteomyelitis. (D.E. 20-11, Page 12).

On December 21, 2016, Plaintiff was again treated at South Texas Brain and Spine Center by Dr. Smith. (D.E. 20-11, Pages 13-15). Plaintiff reported he has constant low back pain radiating down his legs, limiting his activity and made worse by walking, standing, sitting, lying down and bending. (D.E. 20-11, Page 13). Plaintiff is noted as well developed and in no acute distress, using no assistive devices with intact recent and remote memory and normal speech and language. (D.E. 20-11, Page 15). Dr. Smith noted "again he has substantial pain behavior [from] [m]ild palpitation." (D.E. 20-11, Page 15). Dr. Smith opined: "I have told him that I do not have an explanation for his difficulty. I did not see anything I will be able to treat. I will refer him back to pain management. I will bring him back as necessary. I have asked him to call if he has questions or problems." (D.E. 20-11, Page 15).

Plaintiff was treated by Dr. McLeod on December 22, 2016 for back and elbow pain. (D.E. 20-18, Pages 29-31). Plaintiff is again noted as alert, cooperative and oriented. (D.E. 20-18, Page 30). Dr. McLeod noted Plaintiff was "seen by Dr. Smith who stated that he did not see anything wrong and could not help him." (D.E. 20-18, Page 31). He further noted Plaintiff was "seen [by] Dr. Thomas who explained that he could do 2 bone grafts" in his elbow to improve his situation. (D.E. 20-18, Page 31). Dr. McLeod continued to note Plaintiff's left elbow deformity and his restricted range of motion in his back, with some mild muscle wasting in his lower extremities. (D.E. 20-18,

Page 31).  Plaintiff was continued on Cyclobenzaprine, Norco and Mobic.  (D.E. 20-18, Page 31).

On January 23, 2017, Plaintiff was again treated by Dr. McLeod for lumbar back and arm pain.  (D.E. 20-18, Pages 32-34).  Plaintiff reported his back pain was "mild and improving."  (D.E. 20-18, Page 32).  He further stated his symptoms are controlled with medication.  (D.E. 20-18, Page 32).  Plaintiff reported his arm pain was persistent for the past month and his right elbow was also starting to bother him.  (D.E. 20-18, Page 32). Plaintiff is again noted as alert, cooperative and oriented with a normal gait.  (D.E. 20-18, Page 33).  Dr. McLeod continued to note Plaintiff's left elbow deformity and associated limited range of motion as well as a restricted range of motion in his back.  (D.E. 20-18, Page 34).  His medications were continued.  (D.E. 20-18, Page 34).

Dr. Kelly Shannon completed a consultative psychological examination of Plaintiff on February 8, 2017.  (D.E. 20-17, Pages 59-62).[2]  Plaintiff reported he lives alone and his mother checks on and motivates him each day.  (D.E. 20-17, Page 6). Plaintiff reported he was receiving monthly mental health services from Gulf Bend and now "goes every couple of months or so."  (D.E. 20-17, Page 6).  Plaintiff further reported he does not eat regularly, wants to be left alone, has increased irritability, and gets anxious and uncomfortable in most situations causing him to withdraw from others.

---

[2]The record indicates Plaintiff was continuously treated for depression and an unspecified personality disorder at Gulf Bend Center ("Gulf Bend") beginning in 2014 and continuing during the relevant period for which he was prescribed, at varying times, Effexor, Ativan and Trazodone.  (D.E. 20-14; D.E. 20-15; D.E. 20-16; D.E. 20-17, Pages 1-26; D.E. 20-19, Pages 30-71; D.E. 20-20, Pages 68-88; D.E. 20-21, Pages 13-35; D.E. 20-21, Pages 1-28; and D.E. 20-23, Pages 2-24 and 41-43).  Plaintiff was consistently noted as alert, cooperative and well-groomed and feeling sad, anxious, hopeless.  His symptoms are repeatedly reported as stable on his medications.  (D.E. 20-19, Pages 37; D.E. 20-20, Page 84; D.E. 20-21, Page 15 and D.E. 20-23, Pages 3-14).

(D.E. 20-17, Page 60). Dr. Shannon opined Plaintiff was able to manage his own benefit payments and understood the meaning of filing for benefits. (D.E. 20-17, Page 60). She noted Plaintiff was personable and cooperative throughout the examination with a depressed mood and affect. (D.E. 20-17, Pages 60-61). She further noted Plaintiff had a difficulty with concentration but his remote and recent memory were intact. (D.E. 20-17, Page 61). Dr. Shannon determined Plaintiff had major depression with psychotic features and a history of alcohol dependence. (D.E. 20-17, Page 62). She opined he is capable of managing his own funds but "would have a difficult time in relating to supervisors, peers, or the public based upon his current appearance." (D.E. 20-17, Page 62).

On February 23, 2017, Plaintiff was treated by Dr. McLeod for complaints of arm pain. (D.E. 20-18, Pages 35-37). Plaintiff reported the arm pain had been persistent for two months and he described it as mild. (D.E. 20-18, Page 35). Plaintiff reported receiving an injection in his right elbow which provided little relief. (D.E. 20-18, Page 35). Plaintiff again described his lumbar back pain as mild and improving and controlled with medication. (D.E. 20-18, Page 35). Plaintiff is again noted as alert, cooperative and oriented. (D.E. 20-18, Page 36). Dr. McLeod noted Plaintiff's lumber ailments were "stable on current medications." (D.E. 20-18, Page 37). He also advised Plaintiff to purchase a Tennis Elbow strap to give the ligaments in his right elbow a rest. (D.E. 20-18, Page 37).

Plaintiff was next treated by Dr. McLeod on March 23, 2017 for arm pain and lumbar back pain. (D.E. 20-18, Pages 67-69). Plaintiff again described his arm pain as "mild" and noted that his left arm was "still bothering him but it is improving" being

treated with Advil. (D.E. 20-18, Page 67). Plaintiff reported he had "trouble lifting things with the left arm…[and] his right arm is much better." (D.E. 20-18, Page 67). Plaintiff described his back pain again as mild and improving and controlled with medication. (D.E. 20-18, Page 67). Plaintiff is again noted as alert, cooperative and oriented with a normal gait. (D.E. 20-18, Page 68). Dr. McLeod continued to note Plaintiff's left elbow deformity and associated limited range of motion and his restricted range of motion in his back. (D.E. 20-18, Page 69). His prescription for Norco was continued and he was again advised to purchase a Tennie Elbow strap. (D.E. 20-18, Page 69).

MRIs of Plaintiff's left arm on March 28, 2017 showed a "suspected post traumatic deformity of the radial head with slight anterior subluxation" and osteoarthritis with a small joint effusion. (D.E. 20-18, Pages 77-78). There were no findings of osteomyelitis in his left elbow and it confirmed the diagnosis of chronic nonunion fracture of the mid ulnar diaphysis as seen on April 27, 2016. (D.E. 20-19, Page 8).

On April 24, 2017, Dr. McLeod treated Plaintiff for lumbar back pain, arm pain and fatigue. (D.E. 20-18, Pages 70-72). Plaintiff noted his back was mild and worsening but controlled with medication. (D.E. 20-18, Page 70). He also described his arm pain as mild. (D.E. 20-18, Page 70). Plaintiff is again noted as alert, cooperative and oriented with a normal gait. (D.E. 20-18, Page 71). Further testing was ordered for treatment of Plaintiff's fatigue. (D.E. 20-18, Page 72).

Dr. McLeod treated Plaintiff on May 24, 2017 for lumbar back pain, arm pain and a cough. (D.E. 20-18, Pages 73-75). Plaintiff again noted his back pain was mild and

worsening but controlled with medication. (D.E. 20-18, Page 73). He also again noted he was having trouble lifting things with his left arm, his right arm was much better and his arm pain was mild. (D.E. 20-18, Page 73). Plaintiff is again noted as alert, cooperative and oriented. (D.E. 20-18, Page 74). For his back pain, Plaintiff is noted as "stable on current medications. Continue the same dosing. Continues to work on disability. Awaiting insurance relief for further workup." (D.E. 20-18, Page 75). His Norco prescription was continued. (D.E. 20-18, Page 75). Plaintiff was also noted as having started testosterone therapy which improved his energy level. (D.E. 20-18, Page 75).

On June 7, 2017, Plaintiff underwent a whole body bone scan. (D.E. 20-19, Page 4). The conclusion was a "unremarkable bone scan" other than "nonspecific activity in the region of the mid-left forearm, which could reflect recent infection or trauma." (D.E. 20-19, Page 4).

On June 22, 2017, Plaintiff was treated by Dr. McLeod for arm pain. (D.E. 20-20, Pages 43-45). Plaintiff described his arm pain as moderate. (D.E. 20-20, Page 43). Plaintiff described his fatigue as improving with testosterone therapy and he is noted as alert, cooperative and oriented with a normal gait. (D.E. 20-20, Pages 43-44). Plaintiff's lumbar disc disease is noted as stable on current medications which were continued at the same dose. (D.E. 20-20, Page 45).

On July 3, 2017, Dr. Leigh McCary, a state agency non-examining medical consultant, completed a physical RFC assessment opining Plaintiff could occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; could stand and/or walk

about six hours in an eight-hour workday; was limited in his ability to push or pull using his upper left extremity and could only occasionally use his left arm; could perform unlimited postural activities including climbing ramps/stairs, balancing, kneeling, crouching and stooping but could never climb ladders/ropes/scaffolds and only occasionally crawl due to problem with his left arm and was limited in his manipulative abilities involving his left hand including reaching, handling and fingering. (D.E. 20-4, Page 25-27). The same day, Dr. Joel Forgus, also a state agency non-examining medical consultant, completed a mental RFC assessment opining Plaintiff did not have any understanding and memory limitations and was not significantly limited in his ability to carry out very short and simple instructions; to perform activities within a schedule, maintain regular attendance and to be punctual; to sustain an ordinary routine without special supervision; to work in coordination with or in proximity to others without being distracted by them; to make simple, work-related decisions; to interact appropriately with the general public; to ask simple questions or request assistance; to accept instructions and respond appropriately to criticism from supervisors; and to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness. (D.E. 20-4, Pages 27-29). Dr. Forgus further opined Plaintiff was moderately limited in his ability to carry out detailed instructions; to maintain attention and concentration for extended period; and to get along with coworkers or peers without distracting them or exhibiting behavioral extremes. (D.E. 20-4, Page 28). Dr. Forgus concluded Plaintiff was "able to understand, remember and carry out detailed but not complex instructions,

make decisions, concentrate for extended periods, interact without others and respond to changes." (D.E. 20-4, Page 29).

Plaintiff was again treated by Dr. McLeod on July 20, 2017 for arm and back pain. (D.E. 20-20, Pages 47-49). Plaintiff described his arm pain as moderate and his back pain as mild and worsening but controlled with medication. (D.E. 20-20, Page 47). Plaintiff is again noted as alert, cooperative, and oriented with a normal gait. (D.E. 20-20, Page 48). He is noted as stable on current medications for his back, increased energy with testosterone therapy and it is noted that surgery for his arm has been approved. (D.E. 20-20, Page 49). Dr. McLeod also noted he "[s]tressed the necessity of smoking cessation." (D.E. 20-20, Page 49). Dr. McLeod continued to note Plaintiff's left elbow deformity and associated limited range of motion and his restricted range of motion in his back. (D.E. 20-20, Page 49).

Plaintiff was again treated by Dr. Thomas on August 8, 2017 for his left arm pain and reevaluation of left ulna nonunion. (D.E. 20-20, Pages 3-4 and 6-32). Dr. Thomas noted he sent Plaintiff for "a battery of studies to evaluate whether or not this nonunion was possibly an infected nonunion" and they were all negative. (D.E. 20-20, Page 3). Plaintiff is noted as alert and oriented to time and place with a normal gait. (D.E. 20-20, Page 3). Dr. Thomas opined Plaintiff had a hypertrophic nonunion of the left ulna that was not infected and could be treated with bone grafting and compression plating if Plaintiff quit smoking. (D.E. 20-20, Page 4). Dr. Thomas noted these procedures "would not help the degenerative condition of the elbow…[and] [h]e is not a candidate for further surgical intervention." (D.E. 20-20, Page 4). Dr. Thomas opined Plaintiff's "days of

heavy labor are probably over" and it was "likely this patient has permanent disability with regards to left upper extremity." (D.E. 20-20, Page 4).

Dr. McLeod treated Plaintiff on August 21, 2017 for arm and back pain. (D.E. 20-20, Pages 51-53). Plaintiff continued to describe his arm pain as moderate and his back pain as mild and worsening controlled with medication. (D.E. 20-20, Page 51). Plaintiff reported he was fatigued and depressed, presenting for a testosterone injection. (D.E. 20-20, Page 51). Plaintiff is noted as alert, cooperative and oriented with a normal gait. (D.E. 20-20, Page 52). Dr. McLeod again noted Plaintiff's back ailments were stable on current medications and doses and that: "Disability is pending. Will do further workup when he gets insurance." (D.E. 20-20, Page 53). Plaintiff received a testosterone injection and it is noted that "Dr. Thomas claims the elbow is inoperable." (D.E. 20-20, Page 53). Plaintiff's medications continued to include Mobic, Cyclobenzaprine and Norco. (D.E. 20-20, Page 52).

On September 21, 2017, Plaintiff was again treated by Dr. McLeod for back pain and fatigue. (D.E. 20-20, Pages 55-57). Plaintiff described his back pain as mild and unchanged and controlled with medication and his fatigue as improving. (D.E. 20-20, Page 55). Plaintiff is noted as alert, cooperative and oriented with a normal gait. (D.E. 20-20, Page 56). Dr. McLeod noted Plaintiff is stable on the medication for his back pain which he uses sparingly and he has had a moderate increase in energy with testosterone therapy. (D.E. 20-20, Page 56). Dr. McLeod continued to note Plaintiff's left elbow deformity and associated limited range of motion and his restricted range of motion in his back. (D.E. 20-20, Page 56).

Plaintiff was treated by Dr. Renny McDaniel[3] on October 20 and November 20, 2017 for back pain and fatigue. (D.E. 20-20, Pages 59-61 and 63-65). Plaintiff reported his back pain was mild and unchanged and controlled with medication and his fatigue was improving. (D.E. 20-20, Page 59). Plaintiff is again noted as alert, cooperative and oriented with a normal gait. (D.E. 20-20, Pages 60 and 64). Dr. McDaniel noted Plaintiff is stable on the medication for his back pain which he uses sparingly and he has had a moderate increase in energy with testosterone therapy. (D.E. 20-20, Page 61). Plaintiff's continued medications, in relevant part, were Mobic, Cyclobenzaprine and Norco. (D.E. 20-20, Pages 59 and 66).

Plaintiff was again treated by Dr. McDaniel on December 20, 2017 for back pain and fatigue. (D.E. 20-20, Pages 90-92). Plaintiff continued to report his back pain as mild and unchanged and controlled with medication. (D.E. 20-20, Page 90). Plaintiff further reported his fatigue was mild. (D.E. 20-20, Page 90). Plaintiff is noted as alert, cooperative and oriented with a normal gait. (D.E. 20-20, Page 91). His medications were continued. (D.E. 20-20, Pages 91-92).

On January 18, 2018, Plaintiff was treated by Dr. Sheryl Mills, also employed at the Parkside Family Clinic, for back pain and hormone replacement therapy. (D.E. 20-21, Page 9). Plaintiff described his back pain as mild and unchanged and controlled with medication and his fatigue has mild. (D.E. 20-21, Page 9). Plaintiff is noted as alert, oriented with no impairment of recent or remote memory and cooperative with a normal gait. (D.E. 20-21, Page 10). Dr. Mills noted Plaintiff had a "[f]ull active and passive

---

[3] Dr. McDaniel worked at Parkside Family Clinic where Dr. McLeod was employed. (D.E. 20-20, Page 59).

ROM of all extremities, 5/5 motor strength bilaterally" with "painful ROM in knees." (D.E. 20-21, Page 10).

On February 18, 2018, Dr. Mills completed a check the box medical release/physician's statement, opining Plaintiff's disability is permanent because of his cervical disc disease. (D.E. 20-20, Pages 93-97). On February 19 and March 19, 2018, Dr. Mills treated Plaintiff for back pain and male hormone replacement therapy. (D.E. 20-21, Pages 6-9 and 40-41). Plaintiff reported his back pain was mild and improving and controlled with medication. (D.E. 20-21, Pages 6 and 40). Plaintiff further reported his fatigue was mild. (D.E. 20-21, Page 6). Plaintiff is noted as alert, cooperative, oriented with no recent or remote memory impairment and having a normal gait. (D.E. 20-21, Pages 7 and 41). Plaintiff's medications were continued and on February 23, 2018, Plaintiff received a testosterone injection. (D.E. 20-21, Pages 4 and 7).

Plaintiff was again treated by Dr. Mills on April 18 and May 18, 2018 for back pain. (D.E. 20-21, Pages 38-40 and 44-46). Plaintiff again reported his back pain as mild and improving and controlled with medication. (D.E. 20-21, Pages 38 and 44). Plaintiff reported he received a letter stating his pain medication was going to be reduced and also reported he was "working on getting disability." (D.E. 20-21, Page 38). Plaintiff also reported he "[h]as been through pain management and PT but medication is helping him function daily…[and] he doesn't want to go back to drinking to relieve pain." (D.E. 20-21, Page 38). Plaintiff is noted as alert, cooperative, oriented with no recent or remote memory impairment and having a normal gait. (D.E. 20-21, Pages 39 and 45). Dr. Mills also noted Plaintiff had a full active and passive ROM of all extremities with a 5/5 motor

strength bilaterally. (D.E. 20-21, Page 39). Dr. Mills did note on May 18, 2018 that Plaintiff had a decreased range of motion in his left elbow. (D.E. 20-21, Page 45). Plaintiff's Norco prescription was continued. (D.E. 20-21, Pages 38-39 and 44-45).

On June 18, 2018, Dr. Mills treated Plaintiff for back pain and hormone replacement therapy. (D.E. 20-21, Page 49). Plaintiff reported both his back pain and his fatigue as mild and unchanged. (D.E. 20-21, Page 49). Plaintiff's Norco prescription was continued and he received a testosterone injection. (D.E. 20-21, Pages 49 and 51).

On September 21 and October 22, 2018, Plaintiff was treated by Dr. Mills for back pain. (D.E. 20-22, Pages 42-48). Plaintiff reported his pain was mild and worsening with fair symptom control with medication. (D.E. 20-22, Pages 44 and 46). Plaintiff reported he lifted something heavy which increased his back pain, which he also stated was improving but he was still having muscle spasms. (D.E. 20-22, Pages 44 and 46). Plaintiff was noted as being cooperative, alert, oriented and having normal posture, gait and memory with a decreased range of motion in his left elbow. (D.E. 20-22, Pages 45 and 47). His Norco prescription was continued and he received a testosterone injection at the September appointment. (D.E. 20-22, Pages 45 and 48).

On November 21 and December 19, 2018, Plaintiff was again treated by Dr. Mills. (D.E. 20-22, Pages 50-53-55). Plaintiff's chief complaint was high blood pressure after Plaintiff did not take his prescribed medication, reporting side effects. (D.E. 20-22, Page 50). Plaintiff also reported back pain, again describing it as mild and worsening but relieved with pain medication. (D.E. 20-22, Pages 50 and 53). Plaintiff continued to be noted as alert, oriented, and cooperative with no memory impairment and normal posture

and gait, with decreased range of motion in his left arm. (D.E. 20-22, Pages 51 and 54). His Norco prescription was continued and he received a testosterone injection at the December appointment. (D.E. 20-22, Pages 51 and 55). Plaintiff hypertension is noted as stable. (D.E. 20-22, Page 55).

Plaintiff was treated by Dr. Mills on January 23, 2019 for back pain and hormone replacement therapy. (D.E. 20-23, Pages 52-54). Plaintiff reported his pain was mild and worsening and his fatigue was mild and unchanged and both were controlled with medication. (D.E. 20-23, Page 52). Plaintiff is noted as alert, cooperative and oriented with no impairment of recent or remote memory and having a normal posture and gait. (D.E. 20-23, Page 53). Plaintiff's Norco prescription was continued and he received a testosterone injection. (D.E. 20-23, Page 53).

On February 19, 2019, Dr. Mills again completed a check the box medical release/physician's statement, opining Plaintiff's disability is permanent because of post traumatic left elbow arthritis/osteomyelitis and lumbar disc disease. (D.E. 20-23, Pages 45-46).

Dr. Mills treated Plaintiff on February 21, 2019 for back pain. (D.E. 20-23, Pages 49-51). Plaintiff reported his back pain was mild and worsening and Dr. Mills noted "there is good compliance with treatment, good tolerance of treatment and fair symptom control." (D.E. 20-23, Page 49). Plaintiff reported he had been unable to work due to chronic pain. (D.E. 20-23, Page 49). Plaintiff is noted as alert, cooperative, oriented with no impairment of recent or remote memory and having a normal posture and gait. (D.E. 20-23, Page 50). A decreased range of motion in his left elbow is noted. (D.E. 20-23,

Page 50). Plaintiff's Norco prescription was continued and he received a testosterone injection. (D.E. 20-23, Pages 48 and 51).

A hearing was held before the ALJ on March 7, 2019, at which Plaintiff, who was represented by counsel, and a vocational expert ("VE") testified. (D.E. 20-3, Pages 35-65). Plaintiff testified he was right-handed and had difficulty using left arm and hand due to pain and cramping. (D.E. 20-3, Page 46). He further testified that by not being able to use his left arm, he overcompensated using his right side, which led to back problems. (D.E. 20-3, Page 47). Plaintiff also testified he primarily used only his right arm during his work as a machinist. (D.E. 20-3, Pages 62-63). Plaintiff further testified he has dyslexia, has difficulty reading, watches the news, cannot write a letter and was in special education until he graduated from high school at age 20. (D.E. 20-3, Pages 48-49). He began working as a machinist part-time as part of a high school program and then continued working for the same company full-time after he graduated until the company was sold and he was terminated in 2013.[4] (D.E. 20-3, Pages 50-51 and 55). Plaintiff stated his mother checks on him in the morning, he sits on the couch for a few hours each day, lays down for a few hours each day and his mother either brings him lunch and checks on him again or he will go stay with her throughout the day. (D.E. 20-3, Pages 51-52). Plaintiff testified he was a nervous person who liked to be alone or with his mother and not in public. (D.E. 20-3, Page 53). While working as a home health aide for his mother after he was terminated as a machinist, Plaintiff swept and cooked for her but

---

[4]The ALJ noted Plaintiff had "quite a work history there as a machinist." (D.E. 20-3, Page 56). Certified earning records indicate Plaintiff continuously worked there beginning in 1985 until his termination in 2013. (D.E. 20-6, Pages 31-32).

had difficulty assisting her in and out of the restroom so he stopped working for her after he dropped her three times.  (D.E. 20-3, Pages 55-56).[5]

The VE testified that someone of Plaintiff's age, education and work experience who could frequently use his right arm; could never use his left arm; could stand and walk two to three hours per day; and could not bend, squat, kneel or turn any parts of his body would not be able to work at the light exertional level which requires being able to walk six out of eight hours per day.  (D.E. 20-3, Pages 57-58).  The VE then testified that someone who could lift 20 pounds occasionally and 10 pounds frequently with a right dominate arm; could stand about six hours in an eight hour workday; could sit for six hours in an eight hour workday; could frequently use the right upper extremity; could only occasionally crawl and was limited to occasional handling, fingering and reaching with the left hand would be able to perform work at the light exertional level as a parking lot attendant, cashier and ticket seller.  (D.E. 20-3, Pages 58-59).  Adding in no use of the upper left extremity, the VE testified that such an individual would also be able to perform these three jobs as they "are considered to be doable with one arm."  (D.E. 20-3, Page 59).

The ALJ issued an unfavorable decision on April 17, 2019, finding Plaintiff not disabled through the date of the decision finding he is "capable of making a successful adjustment" to working as a parking lot attendant, cashier and ticket seller.  (D.E. 20-3, Pages 11-26).

---

[5]Certified earning records indicated Plaintiff worked as a home health aide from 2015 through 2017.  (D.E. 20-6, Pages 31-32).  As noted by the ALJ, the earnings from this position did not qualify as substantial gainful activity and therefore, this was not considered past relevant work.  (D.E. 20-3, Pages 13 and 55 and D.E. 20-6, Pages 31-32).

## VI.  THE ALJ'S DECISION

In the April 17, 2019 decision, the ALJ determined Plaintiff had not been under a disability through the date of the decision.  (D.E. 20-3, Pages 11-26).  The ALJ found Plaintiff met the insured status requirements through December 31, 2018 and he had not engaged in substantial gainful activity since October 16, 2015, the alleged onset date.  (D.E. 20-3, Page 13).[6]  The ALJ further found Plaintiff had the following severe impairments:  left elbow posttraumatic osteoarthritis, degenerative disc disease and major depressive disorder.  (D.E. 20-3, Page 14).  The ALJ then found Plaintiff had no impairment or combination of impairments that met or medically equaled the severity of a listed impairment.  (D.E. 20-3, Page 14).  As a result, the ALJ determined Plaintiff had the RFC to perform a modified range of light work.  (D.E. 20-3, Page 16).  Specifically, the ALJ found Plaintiff could lift up to 20 pounds occasionally and 10 pounds frequently with his right dominant upper extremity; could stand and sit for 6 hours in an 8-hour workday, each; could frequently use the right upper extremity and could occasionally reach with the left upper extremity; could only occasionally crawl; could only occasionally handle and finger with the left hand with full use of the right hand with no limitations; and he had some limitations with respect to concentration and persistence of pace limiting him to unskilled work.  (D.E. 20-3, Page 16).  The ALJ determined Plaintiff was unable to perform his past relevant work[7] but that considering Plaintiff's age,

---

[6]The ALJ found Plaintiff had earned $7,547.75 in 2016 and $7,734.65 in 2017 and these earnings fell below the level of substantial gainful activity for 2016 and 2017.  (D.E. 20-3, Page 13).
[7]Petitioner has a high school degree and past relevant work as a machinist.  (D.E. 20-3, Pages 24-25 and 55-57 and D.E. 20-7, Page 28).

education, work experience and RFC, he was capable of performing work as a parking lot attendant, a cashier or a ticket seller. (D.E. 20-3, Page 25). Therefore, the ALJ concluded Plaintiff was not disabled from October 16, 2015, the alleged onset date, through April 17, 2019, the date of the decision. (D.E. 20-3, Page 26).

## VII. ANALYSIS

Plaintiff contends the ALJ failed to properly evaluate the opinion of Dr. McLeod and to fully consider his mental ailments when determining his RFC. Plaintiff further asserts the ALJ failed to properly consider Plaintiff's work history when assessing Plaintiff's credibility related to his subjective complaints. For the reasons stated below, Plaintiff's arguments are without merit.

An individual claiming disability has the burden of proving disability and must prove the inability to engage in any substantial gainful activity. *Hames v. Heckler*, 707 F.2d 162, 165 (5th Cir. 1983) (citation omitted). "The mere presence of some impairment is not disabling per se. Plaintiff must show that she was so functionally impaired by her [disability] that she was precluded from engaging in any substantial gainful activity." *Id.* (citations omitted). Further, it is the task of the ALJ, not this Court, to weigh the evidence. *Hames*, 707 F.2d at 166; *Holmes v. Colvin*, 555 F. App'x 420, 421 (5th Cir. 2014) (citing *Bowling*, 36 F.3d at 434). "It is not the place of this Court to reweigh the evidence, or try the issue de novo, or substitute its judgment…[i]f supported by substantial evidence, the Secretary's findings are conclusive and must be affirmed." *Id.*

An RFC is an assessment, based on all relevant evidence, of a claimant's ability to do work on a sustained basis in an ordinary work setting despite impairments. 20 C.F.R. § 404.1545(a); *Myers v. Apfel*, 238 F.3d 617, 620 (5th Cir. 2001) ("RFC involves both exertional and non-exertional factors.") RFC refers to the most a claimant is able to do despite physical and mental limitations. 20 C.F.R. § 404.1545(a). The ALJ must consider all symptoms, including pain, and the extent to which these symptoms can be reasonably accepted as consistent with objective medical evidence and other evidence. The ALJ is not required to incorporate limitations in the RFC that are not supported in the record. *Muse v. Sullivan*, 925 F.2d 785, 790 (5th Cir. 1991) ("The ALJ as factfinder has the sole responsibility for weighing the evidence and may choose whichever physician's diagnosis is most supported by the record.") (citation omitted). Here, the ALJ thoroughly summarized and analyzed Plaintiff's conditions, including any subjective complaints and the objective medical evidence, finding Plaintiff had multiple severe impairments, including left elbow posttraumatic osteoarthritis, degenerative disc disease and major depressive order, but no impairment or combination of impairments that met or medically equaled the severity of a listed impairment. (D.E. 20-3, Page 14). After finding Plaintiff was incapable of performing his past relevant work, the ALJ determined Plaintiff had the RFC to perform a modified range of light work, taking into account Plaintiff's physical and mental impairments. (D.E. 20-3, Pages 14-26).

Plaintiff first argues the ALJ failed to provide sufficient reasons for rejecting the August and December 2016 opinions of treating physician Dr. McLeod. However, the ALJ did not disregard Dr. McLeod's opinion entirely, instead giving it "little weight."

(D.E. 20-3, Page 23). While Dr. McLeod opined Plaintiff was more limited in certain areas than found by the ALJ, the ALJ is not bound by Dr. McLeod's assessment so long as the ALJ sufficiently explained the weight assigned to his opinions. *Beck v. Barnhart*, 205 F. App'x 207, 213-14 (5th Cir. 2006); *Audler v. Astrue*, 501 F.3d 446, 448 (5th Cir. 2007). An ALJ may reject any opinion, in whole or in part, "when the evidence supports a contrary conclusion." *Martinez*, 64 F.3d at 176. This is what occurred here.

The ALJ found Dr. McLeod's opinion regarding Plaintiff's physical limitations, specifically the limitations on his ability to ambulate and to use his right arm resulting in a general inability to work,[8] were not supported by his own treatment records or the record as whole. (D.E. 20-3, Page 23; D.E. 20-17, Pages 30-33 and D.E. 20-18, Pages 17-19). As noted by the ALJ, "[t]here are no objective tests showing the claimant has limitations in ambulation due to lumbar spine degenerative disc disease" and Plaintiff's "right arm remains grossly normal." (D.E. 20-3, Page 23).

Plaintiff cites to portions of Dr. McLeod's treatment records where Dr. McLeod noted a reduced range of motion in Plaintiff's left elbow and lower back as well as muscle wasting in Plaintiff's lower extremities and diminished sensation in Plaintiff's feet in addition to Plaintiff's consistent complaints of pain related to his back and left arm. (D.E. 22, Pages 10-18). However, Plaintiff completely ignores the conservative

---

[8]Dr. McLeod opined Plaintiff could continuously sit, stand for two to three hours per day and could walk 200 yards without stopping, could not reach above his shoulders, reach down to waist level or towards the floor and could not carefully handle objects or handle them with his fingers. (D.E. 20-11, Page 46 and D.E. 20-17, Pages 31-32). He further opined Plaintiff could lift and carry 5-10 pounds regularly and could not bend, squat, kneel, twist or turn. (D.E. 20-1, Page 46 and D.E. 20-17, Page 32). He also concluded Plaintiff "has no ability to work at this time…and is clearly disabled physically" and Plaintiff "is clearly medically disabled entirely…[as he] is unable to use left arm; back pain persistent even with ADL's." (D.E. 20-11, Page 47 and D.E. 20-18, Page 19).

treatment Dr. McLeod prescribed to treat Plaintiff's back, namely pain medication, and that Plaintiff consistently reported this treatment controlled what he described as "mild" back pain. (D.E. 20-11, Pages 34 and 65; D.E. 20-18, Pages 32, 35, 55, 67, 70 and 73; D.E. 20-20, Pages 47, 51, 55, 59, and 90; D.E. 20-21, Pages 6, 4, 9, 10, 38, 44, and 49; D.E. 20-22, Pages 44, 46, 50 and 53; and D.E. 20-23, Pages 49 and 52); *James v. Bowen*, 793 F.2d 702 (5th Cir. 1986) (citation omitted) (Impairments controlled by medication are not disabling). Further, Dr. McLeod noted on several occasions in 2017 that Plaintiff's back pain was stable on current medications. (D.E. 20-18, Pages 13, 75 and D.E. 20-20, Pages 45 and 53). Additionally, the record is replete with references to Plaintiff's normal gait and posture from multiple treating physicians, including Dr. McLeod and other doctors at the Parkside Family Clinic. (D.E. 20-10, Pages 36 and 63; D.E. 20-11, Pages 11, 15 and 65; D.E. 20-14, Page 7; D.E. 20-18, Pages 24, 33, 68 and 71; D.E. 20-22, Pages 45, 47, 51 and 54; D.E. 20-23, Pages 50 and 53). Further, Dr. Mills opined in January and April 2018 that, in addition to a normal gait and posture, Plaintiff had a full and active range of motion in all extremities, noting Plaintiff's left elbow ailment. (D.E. 20-21, Pages 10 and 39).

Additionally, the objective testing indicates at most mild deficiencies in Plaintiff's back and there are no objective tests indicating any ailments in Plaintiff's upper right extremity. In July 2014, Plaintiff's cervical spine was found to be normal as was Plaintiff's lumbar spine in February 2015. (D.E. 20-8, Page 3 and D.E. 20-10, Page 47). An MRI of Plaintiff's lumbar spine on December 15, 2015 found Plaintiff had maintained disc spaces with mild disc bulges identified at L 4/5 and L5/S1, more pronounced at

L4/5. (D.E. 20-10, Pages 41-42). Only "minimal degenerative changes" were noted in Plaintiff's cervical spine in July 2016. (D.E. 20-11, Pages 51-52). In August 2016, an MRI showed no "degenerative changes of the lower lumber spine, not significantly changed from prior study [in December 2015]." (D.E. 20-11, Page 54). December 2016 x-rays of both Plaintiff's cervical and lumbar spine were normal. (D.E. 20-11, Pages 3 and 5). Further, Dr. Smith from the South Texas Brain and Spine Center noted Plaintiff's lumbar and cervical spine MRIs showed only mild deficiencies. (D.E. 20-10, Page 61). Dr. Smith also noted in November and December 2016 that Plaintiff "has a great deal of pain behavior" to even mild palpation but he "did not see anything to account for [Plaintiff's] difficulties in his cervical or lumbar spine MRI" and "I have told him that I do not have an explanation for his difficulty. I did not see anything I will be able to treat." (D.E. 20-10, Page 63 and D.E. 20-11, Page 15). Additionally, a December 2016 EMG found "no significant abnormalities" in Plaintiff's bilateral upper and lower extremities and a June 2017 whole body bone scan was found to be "unremarkable" except for "nonspecific activity in the region of the mid-left forearm." (D.E. 20-19, Page 4 and D.E. 20-11, Page 18). Therefore, the ALJ correctly noted Dr. McLeod's opinion was not supported by objective testing and also correctly noted Plaintiff "has not been recommended to any surgical intervention for his back." (D.E. 20-3, Page 23).

Additionally, Plaintiff incorrectly argues the ALJ was required to consider and articulate an analysis of the *Newton* factors in his decision before discounting Dr. McLeod's opinion. *Newton v. Apfel*, 209 F.3d 448, 453 (5th Cir. 2000) (An ALJ must perform a detailed analysis of the factors under 20 C.F.R. § 404.1527 before giving less

than controlling weight to the treating physician's opinion); 20 C.F.R. § 404.157(c).[9] Generally, the opinion of a treating physician who is familiar with the claimant's history should be given more weight in determining disability. *Id.*; *Newton*, 209 F.3d at 455. However, only when rejecting a treating physician's opinion must the ALJ perform a detailed analysis of the treating physician's view under the criteria set forth above. *Manzano v. Berryhill*, No. 4:16-cv-3496, 2018 WL 1518558, at *10 (S.D. Tex. Mar. 28, 2018) (citing *Jones v. Astrue*, 821 F.Supp.2d 842, 852 (N.D. Tex. 2011) (An ALJ is not required to perform the six-step analysis discussed in *Newton* when the treating physician's opinion is not entirely rejected but is rather given less or little weight); *Newton*, 209 F.3d at 453.

Again, an ALJ may reject any opinion, in whole or in part, "when the evidence supports a contrary conclusion." *Martinez*, 64 F.3d at 176 (citation omitted). The ALJ considered those portions of Dr. McLeod's assessment supported by his examination findings and consistent with the record as a whole. *Garcia v. Colvin*, 622 F. App'x 405, 409 (5th Cir. 2015) (An ALJ may place less weight, little weight, or even no weight on a report if statements are brief or conclusory, not supported by medically acceptable clinical laboratory diagnostic techniques, or otherwise unsupported by the evidence). An ALJ "is entitled to determine the credibility of medical experts as well as lay witnesses and weigh their opinions accordingly." *Greenspan*, 38 F.3d at 237 (citation omitted); *Heck v. Colvin*, 674 F. App'x 411, 415 (5th Cir. 2017) (Responses to a questionnaire

---

[9]The factors under 20 C.F.R. § 404.1527(c) are: (1) the physician's length of treatment of the claimant; (2) the physician's frequency of examination; (3) the nature and extent of the treatment relationship; (4) the support of the physician's opinion afforded by the medical evidence of record; (5) the consistency of the opinion with the record as a whole; and (6) the specialization of the treating physician.

format may be disregarded under the good cause exception when lacking "explanatory notes" or "supporting objective tests and examinations.") (citation omitted). Here, the ALJ discussed the competing evidence in the decision, including the observations and findings of Dr. McLeod, and found the ambulation and right arm limitations were not supported for the reasons discussed above. Having reviewed the record, the undersigned finds Plaintiff's first argument is without merit as substantial evidence supports the weight the ALJ gave to Dr. McLeod's opinion, a more detailed analysis was not required under *Newton* and the ALJ had no duty to obtain additional evidence.

Plaintiff next asserts the ALJ did not properly take into account his mental ailments when determining his RFC. The undersigned finds this argument is without merit and that substantial evidence supports the ALJ's decision. The ALJ found at Step Two that Plaintiff had a major depressive disorder, a severe mental impairment. (D.E. 20-3, Page 14). After consideration of the record, the ALJ limited Plaintiff to unskilled work, taking into account his mental limitations. (D.E. 20-3, Pages 16 and 22). In doing so, the ALJ clearly relied upon the opinion of consultative psychological examiner, Dr. Shannon, as well as Plaintiff's treatment records from Gulf Bend and other providers in addition to Plaintiff's own testimony and function reports as well as the opinions of state agency medical consultants. The ALJ correctly noted Plaintiff lives alone and takes care of his own personal care including dressing, bathing, shaving and feeding himself. (D.E. 20-3, Page 15 and D.E. 20-7, Pages 46-47 and 61-62). He reported cooking his own meals on a daily basis, caring for a pet, cleaning three times a week for four hours and shopping for groceries twice a month for two to four hours. (D.E. 20-7, Pages 63-64).

These activities were assisted by his mother or family, who also reminded him to take his medication. (D.E. 20-7, Pages 46-77 and 61-62). The ALJ also noted Plaintiff was able to respond to questioning at the hearing about his previous work activity. Additionally, throughout the relevant period, Plaintiff received regular mental health services from Gulf Bend where his mental ailments were reported as stable on medications and he was consistently noted as alert, cooperative and well-groomed despite feeling sad, anxious and hopeless. (D.E. 20-3, Page 21; D.E. 20-19, Pages 37; D.E. 20-20, Page 84; D.E. 20-21, Page 15 and D.E. 20-23, Pages 3-14). As noted by the ALJ, in December 2018, Plaintiff was noted as stable on his current medications; appropriately dressed and well groomed; with normal speech, language, mood and euthymic affect; good concentration and attention span; coherent and goal directed thought process and cognition without evidence of abnormal or delusion thought content or cognitive disturbance with a good fund of knowledge for developmental level; oriented to time place, person and situation; and intact immediate, recent and remote memory. (D.E. 20-23, Pages 3-15). His medications were continued and he was scheduled for a six month follow-up appointment. (D.E. 20-23, Pages 7-8). Additionally, Dr. Shannon opined Plaintiff was able to manage his own benefit payments and understood the meaning of filing for benefits, was personable and cooperative throughout the examination with a depressed mood and affect, had a normal stream of mental activity and speech, had difficulty with concentration but his remote and recent memory were intact and appeared "to be functioning at the borderline level of intelligence…and may well have learning disabilities." (D.E. 20-17, Pages 59-64). Further, throughout the relevant time period,

Plaintiff is repeatedly noted by all of his treating physicians as alert, cooperative, oriented, and having normal mood and affect with no impairment of recent or remote memory. (D.E. 20-10, Pages 36, 59, 62; D.E. 20-11, Pages 11, 15, 59, 61, 63, 65; D.E. 20-14, Page 8; D.E. 20-18, Pages 17, 18, 24, 27, 30, 33, 36, 68, and 74; D.E. 20-20, Pages 43-44, 48, 52, 56, 60, 64, and 91; D.E. 20-21, Pages 7, 10, 39, 41 and 45; D.E. 20-22, 20-23, 45, 47, 50, 51, and 53; and D.E. 20-23, Page 50). Additionally, a state agency consultant, who the ALJ afforded moderate weight, concluded Plaintiff was "able to understand, remember and carry out detailed but not complex instructions, make decisions, concentrate for extended periods, interact without others and respond to changes." (D.E. 20-4, Page 29). After discussing this record, the ALJ determined Plaintiff had the mental RFC to perform unskilled work. Given the above evidence in the record, the undersigned finds this determination is supported by substantial evidence.

In his last argument, Plaintiff asserts the ALJ failed to consider his work history when assessing his subjective complaints. This is belied by the ALJ's questioning of Plaintiff during the hearing when the ALJ noted Plaintiff had "quite a work history there as a machinist." (D.E. 20-3, Page 56). Further, it is well settled that an ALJ's credibility findings on a claimant's subjective complaints are entitled to deference. *See Chambliss v. Massanari*, 269 F.3d 520, 522 (5th Cir. 2001). Subjective complaints must be corroborated, at least in part, by objective medical findings. *Harrell v. Bowen*, 862 F.2d 471, 481 (5th Cir. 1988) (citations omitted); *Owens v. Heckler*, 770 F.2d 1276, 1281-82 (5th Cir. 1985); *Chambliss*, 269 F.3d at 522. For pain to rise to the level of disabling, that pain must be "constant, unremitting, and wholly unresponsive to therapeutic

treatment." *Chambliss*, 269 F.3d at 522; *Hames*, 707 F.2d at 166(citations omitted). The test for disability under the Act is not satisfied merely because Plaintiff cannot work without some pain or discomfort. *Id*. "Plaintiff must show that she is so functionally impaired that she is precluded from engaging in substantial gainful activity." *Id*. An ALJ may discount subjective complaints of pain as inconsistent with other evidence in the record. *Dunbar v. Barnahrt*, 330 F.3d 670, 672 (5th Cir. 2003) (citing *Wren v. Sullivan*, 925 F.2d 123, 128 (5th Cir. 1991).

There are inconsistencies in the record regarding the extent of Plaintiff's physical and mental limitations and his performance of daily activities, as described above, and the ALJ properly weighed this evidence before reaching a credibility determination. As discussed above, Plaintiff's ailments were responsive and controlled with medication. Here, the ALJ considered Plaintiff's subjective complaints and testimony regarding his limitations, the objective medical evidence, his daily activities and other pertinent factors and found that while Plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms, his statements concerning the intensity, persistence and limiting effects were not entirely credible and he was capable of performing a modified range of light work without frequently using his left hand or arm. Even though the record illustrates Plaintiff suffers from several severe impairments, substantial evidence supports the ALJ's conclusion that Plaintiff's impairments did not prevent him from performing light work with restrictions as identified in the RFC during the period at issue. Ultimately, the ALJ sufficiently explained why certain opinions were

discounted. While Plaintiff asserts the ALJ erred, the undersigned disagrees and finds Plaintiff is simply asking this Court to reweigh the evidence.

## VIII. CONCLUSION

For the reasons discussed above, Plaintiff's Motion for Summary Judgment is **DENIED** (D.E. 22), the Commissioner's Motion for Summary Judgment is **GRANTED** (D.E. 24), the Commissioner's determination is **AFFIRMED**, and this case is **DISMISSED with prejudice**.

ORDERED this 14th day of May, 2021.

Jason B. Libby
United States Magistrate Judge